## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **MATTHEW CRANE,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **C.A. No.:  20-CV-30159-MGM** |
| | : | |
| **JOSEPH KOZLOWSKI, ERIC** | : | |
| **ORTIZ and MICKY DUMAIS,** | : | |
| **Defendants.** | : | |
| _____ | : | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS SUBMITTED IN COMPLIANCE WITH LR, D.Mass. 56.1 IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to LR, D.Mass. 56.1, the following statement of undisputed material facts[1] is submitted in connection with the defendants' motion for summary judgment:

## I.    INTRODUCTION

1.    Plaintiff Matthew Crane, a forty-five year old male, was born in Springfield, raised in Springfield and has resided in Springfield throughout his life.  *See* Portions of the Deposition of Matthew Crane, appended hereto and designated as "Attachment A[,]" pp. 11-13.

2.    Although defendant Joseph Kozlowski now is a police officer in Egremont, Massachusetts and although defendant Eric Ortiz now is a police sergeant with the Chicopee Police Department, as of October, 2018, Kozlowski, Ortiz and Dumais all worked as police officers for the Chicopee Police Department.  *See* Affidavit of Joseph Kozlowski, appended hereto and designated as "Attachment B[,]" ¶ 3; Affidavit of Eric Ortiz, appended hereto and

---

[1] It is a familiar summary judgment principle that properly supported facts are to be construed in the light most favorable to the non-moving party, in this instance, the plaintiff.  *See Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003).  Consistent with that approach, this statement of facts constitutes either a factual predicate that is not, or cannot be, disputed by the plaintiff or that reflects his version of events.  Where the plaintiff has offered inconsistent statements, those statements are included.  To the extent that disputes may exist, the plaintiff's version of events is accepted for present purposes but, in so doing through this motion practice, the defendants do not concede the accuracy of the plaintiff's version in any such instance.

designated as "Attachment C[,]" ¶ 3; Affidavit of Micky Dumais, appended hereto and designated as Attachment D[,]" ¶¶ 1-2.

## II.    THE MATERIAL PRELUDE TO THE PLAINTIFF'S OCTOBER, 2018 ARREST

### A.    The History of the Plaintiff's Driver's Licensure

3.    During his deposition, the plaintiff testified that, as of October, 2018, his driver's license had been suspended for some years.  *See* Attachment A, p. 15.

4.    Appended hereto and designated as "Attachment E" is the record of the plaintiff's cases in Springfield District Court.  *See* Attachment E, pp. 1-3.  Those judicial records reveal, excluding instances in which charges relating to the plaintiff's driver's licensure did not result in guilty determinations, that the plaintiff :

(1) was found guilty of operating a motor vehicle with a suspended license in 2000; *see* Attachment E, p. 4 (Docket No.:  9923CR013269);

(2) was found guilty of unlicensed operation of a motor vehicle in 2001; *see* Attachment E, p. 7 (Docket No.:  0023CR011297);

(3) was found guilty of operating a motor vehicle with a suspended license with a subsequent offense designation, in 2001; *see* Attachment E, p. 9 (Docket No.: 0123CR001897);

(4) was found guilty of operating a motor vehicle with a suspended license in 2001; *see* Attachment E, p. 12 (Docket No.:  0123CR002296);

(5) was found guilty of operating a motor vehicle with a suspended license, with a subsequent offense designation, in 2005; *see* Attachment E, p. 14 (Docket No.: 0323CR008094);

(6) was found guilty of operating a motor vehicle after license revocation in 2005; *see* Attachment E, pp. 16-17 (Docket No.: 0323CR012204);

(7) was found guilty of operating a motor vehicle with a suspended license in 2005; *see* Attachment E, p. 19 (Docket No.: 0423CR002902);

(8) was found guilty of operating a motor vehicle after license revocation in 2008; *see* Attachment E, p. 21 (Docket No.: 0723CR009890);

(9) was found guilty of operating a motor vehicle with a suspended license, with a subsequent offense designation, in 2009; *see* Attachment E, p. 23 (Docket No.: 0923CR001967);

(10) was found guilty of operating a motor vehicle with a suspended license in 2009; *see* Attachment E, p. 25 (Docket No. 0923CR007807); and,

(11) was found guilty of operating a motor vehicle after license revocation in 2011. *See* Attachment E, p. 27 (Docket No. 1123CR005674.

5.    Appended hereto and designated as "Attachment F" is the record of the plaintiff's cases in Palmer District Court. *See* Attachment F, p. 1. Those judicial records, excluding instances in which charges concerning driver's licensure did not result in guilty determinations, reveal that the plaintiff:

(1) was found guilty of operating a motor vehicle with a suspended license, with a subsequent offense designation, in 2008; *see* Attachment F, p. 2; and,

(2) was found guilty of operating a motor vehicle after license revocation in 2014. *See* Attachment F, p. 5.

6.    Appended hereto and designated as "Attachment G" is the record of the plaintiff's cases in Chicopee District Court. *See* Attachment G, p. 1. Those judicial records, excluding instances

in which charges concerning driver's licensure did not result in guilty determinations, reveal that the plaintiff:

> (1) was found guilty of unlicensed operation of a motor vehicle in 2000; *see* Attachment G, p. 2 (Docket No.: 0020CR000819); and,

> (2) was found guilty of operating a motor vehicle with a suspended license in 2002. *See* Attachment G, p. 4 (Docket No.: 0120CR001909).

7.    Appended hereto and designated as "Attachment H" is the record of the plaintiff's case in Eastern Hampshire District Court. *See* Attachment H, p. 1. In 2008, the plaintiff was found guilty of operating a motor vehicle after license revocation. *See* Attachment H, p. 2.

8.    As of October, 2018, the plaintiff's license to operate a motor vehicle still was suspended. *See* October 6, 2018 CJIS printout, appended hereto and designated as "Attachment I[.]"

9.    According to the plaintiff, he was aware that, as of October 5, 2018, he did not have a license to operate a motorcycle and that, while he had been licensed previously, he believes that he was declared a habitual traffic offender and lost his license in 2010 or 2011. *See* Attachment A, pp. 76-77. From that point, through his arrest in 2018 and continuing to the present day, the plaintiff never has regained the ability to operate either a motor vehicle or a motorcycle. *See* Attachment A, pp. 77-78.

10.    During his deposition, the plaintiff was asked specifically about his licensure as of the night of his arrest:

> Q.    You were operating a motorcycle without a license?

> A.    Yes.

Attachment A, p. 157; *see also* Attachment A, p. 76 (as of October 5, 2018, the plaintiff did not have a license to operate a motorcycle).

**B.    The History of the Plaintiff's Firearm Possession**

11.    At some point perhaps in the summer of 2018, the plaintiff purchased a 9 mm Smith and Wesson firearm.  *See* Attachment A, pp. 91-93.  It was the first firearm that the plaintiff ever had purchased and he did so for reasons of personal safety, as he explained during his deposition that there was a motorcycle club that was terrorizing the Springfield area at the time and, while the plaintiff was not in a motorcycle club, he had a motorcycle.  *See* Attachment A, pp. 93-94.

12.    The plaintiff, however, was not licensed to carry a firearm and never has possessed a license to carry or a firearms identification card.  *See* Attachment A, p. 92.

13.    The firearm was purchased when an individual known to the plaintiff served as a liaison to connect the plaintiff with another person previously unknown to the plaintiff.  *See* Attachment A, pp. 94-95.

14.    The plaintiff was given a time and a place, specifically the parking lot of the Red Rose Pizzeria in Springfield, to meet this unknown individual and, at that time, the plaintiff provided this unknown individual with $400; in exchange, the plaintiff was given the firearm, a magazine and ammunition.  *See* Attachment A, pp. 94-96.

15.    The plaintiff was not told how this unknown individual came to possess the weapon and there was no paperwork completed to effectuate a transfer of ownership.  *See* Attachment A, p. 97.

16.    The plaintiff testified during his deposition that he knew that he possessed the firearm illegally.  *See* Attachment A, p. 97.

17.     After the plaintiff purchased the gun, he went into the woods at Forest Park and fired it once.  *See* Attachment A, p. 96.  The gun worked and the plaintiff never fired it again.  *See* Attachment A, pp. 96-97.

## III.     THE EVENTS OF OCTOBER 5-6, 2018

### A.     The Plaintiff's Initial Travels

18.     On Friday, October 5, 2018, the plaintiff's present memory is that he likely went in the morning to his job at the time, which was at Springfield Technical Community College.  *See* Attachment A, pp. 62-63.

19.     After work, the plaintiff believes that he likely smoked marijuana.  *See* Attachment A, pp. 64-65.  At that time, the plaintiff was smoking marijuana daily or almost daily.  *See* Attachment A, pp. 75, 180.  The plaintiff's usual consumed amount of marijuana would range from an eighth to four grams.  *See* Attachment A, p. 65.

20.     At approximately 8 p.m. or 9 p.m., the plaintiff met acquaintances at a 7-11 in Springfield and, from there, went to a nearby friend's house.  *See* Attachment A, pp. 73-74.  At the house, the group worked on a plan for the night to celebrate a friend's birthday.  *See* Attachment A, p. 74.

21.     The plaintiff was at the house for approximately two to three hours and has testified that he was not drinking alcohol during that window of time but did smoke one gram of marijuana in a blunt.  *See* Attachment A, pp. 74-75.

22.     Ultimately the decision was made for the group to go to "My Brothers Place" in Chicopee, about ten to fifteen minutes away from the then-present location of the group.  *See* Attachment A, pp. 75-76.

23.     The plaintiff drove his motorcycle to the bar without any passenger.  *See* Attachment A, p. 76.  The plaintiff did not, and knew that he did not, have a license to operate a motorcycle on October 5, 2018.  *See* Attachment A, p. 76.

24.     The plaintiff arrived at My Brothers Place at approximately 11 p.m. to 12 a.m. and testified that he drank two beers at the bar.  *See* Attachment A, p. 78.

25.     The plaintiff also testified that he paid cash for the beers and that he had a couple of hundred dollars on him when he arrived at the bar.  *See* Attachment A, pp. 79-80.  The plaintiff testified that, when he left the bar that night, he had half or a little less of that money left.  *See* Attachment A, p. 80.  According to the plaintiff, he chipped in to pay for some wings and he believes that he bought a beer, someone bought a beer for him and he otherwise bought one or two rounds for a group of seven to ten people.  *See* Attachment A, pp. 79-81.  During his deposition, the plaintiff estimated that he spent about $100 on alcohol that night but was "certain" that he only had about two beers.  *See* Attachment A, pp. 80-81.

26.     The plaintiff recalls the lights coming on in the bar to signify that it was closing time somewhere around 1:30 a.m. on October 6, 2018.  *See* Attachment A, pp. 82-83.

27.     At that point, the plaintiff's plan was for him to take his motorcycle back to his friend's house in Springfield, followed by two females that the plaintiff met that night; at that point the plaintiff planned to go with those females to a different party.  *See* Attachment A, pp. 83-87.

28.     The plaintiff testified that he did not believe that he was impaired by drugs, alcohol or both drugs and alcohol at that point.  *See* Attachment A, pp. 87-88.

29.     At that point, the plaintiff, who "always" carries a knife, had a folding knife on a clip on his waist.  *See* Attachment A, pp. 89-90.

30.     The plaintiff testified that he has no memory of the 9 mm firearm being on his person that night, but he does have a memory of taking the firearm with him when he left his home on October 5, 2018.  *See* Attachment A, pp. 98-99.  The plaintiff testified that, when riding his motorcycle during that period of time in 2018, he usually would have the firearm in or around the motorcycle and he believes that the firearm that night might have been under his motorcycle seat on October 5, 2018.  *See* Attachment A, pp. 91, 97-99.  The gun, however, was loaded with the magazine affixed to it.  *See* Attachment A, pp. 91-92.

**B.      The Police Encounter**

31.     At the point in time that the plaintiff was leaving My Brothers Place, various other individuals also were leaving the area and heading in a variety of directions.  *See* Attachment A, pp. 100-102.

32.     The plaintiff was wearing a helmet along with protective clothing, including a jacket and gloves.  *See* Attachment A, pp. 103-104.

33.     The plaintiff testified that there were police cruisers in the area but he had no particular thoughts concerning police presence in the area while he was operating a motorcycle without a license, after smoking marijuana and drinking alcohol and while armed with a knife and a 9 mm firearm.  *See* Attachment A, pp. 104-107.  At the same time, however, the plaintiff testified that he never wants to interact with the police.  *See* Attachment A, p. 107.

34.     The plaintiff also testified that, as he departed from My Brothers Place that night, he "probably" was doing the speed limit on the area roadways on which he was travelling.  *See* Attachment A, p. 103.

35.     According to the plaintiff, he came to a stop at a stop sign and was in the process of making a right turn when he was struck from behind by the vehicle of the females who were following him.  *See* Attachment A, pp. 103-104, 107-108.

36.     The plaintiff just had begun moving to make the right turn at the time of impact and estimates that he might have been going seven to eight miles per hour at that time.  *See* Attachment A, pp. 108-110.

37.     The plaintiff did not see the vehicle coming at him at the time of impact and does not recall hearing tires squeal prior to the impact.  *See* Attachment A, pp. 108, 110-111.  Based upon the force that he felt from the collision, the plaintiff's opinion is that the females' vehicle could have been traveling at thirty to thirty-five miles per hour at the time.  *See* Attachment A, p. 110.

38.     The force of the impact pushed the plaintiff's motorcycle toward a median island, where the motorcycle struck the curb and the plaintiff flipped over the handlebars, lost engagement with the motorcycle and landed on his back in the grass of the island.  *See* Attachment A, pp. 108-111.

39.     The plaintiff recalls being struck and flipping over his motorcycle but testified that the next thing he can recall is waking up, not on the ground, but with two police officers holding him on either side, "like I was Jesus on the cross," and that the officers were "telling me to get on the ground."  *See* Attachment A, p. 115.

40.     The plaintiff also testified inconsistently to a memory of waking up on the ground, at which point he "jumped up from the shock of what just happened[]" and, "as soon as" the plaintiff jumped up, officers were on him.  *See* Attachment A, p. 115.

41.     At or around the time of regaining consciousness, the plaintiff recalled one officer on his

right and one on his left at that point and he said that these officers were telling him to get on the ground and not to move.  *See* Attachment A, pp. 116-17.

42.     Some minutes earlier, at around 1:45 a.m. on October 6, 2018, Officer Joseph Kozlowski was on patrol, in uniform and operating a marked cruiser on Grove Street in Chicopee.  *See* Attachment B, ¶¶ 4-5.

43.     Kozlowski passed two motorcycles and two cars that were facing in the opposite direction from him on Grove Street and noticed that, once he passed them in his cruiser, the vehicles entered the roadway and began to drive away.  *See* Attachment B, ¶ 5.  Kozlowski decided to perform a U-turn and head in the same direction as those vehicles.  *See* Attachment B, ¶ 6.

44.     Kozlowski traveled from Grove Street to Broadway Street, travelling up to forty miles per hour, the speed limit on that roadway, but not gaining ground and soon losing sight of the vehicles.  *See* Attachment B, ¶ 7.

45.     As he approached the intersection of Broadway Street and Abbey Memorial Drive, Kozlowski heard a loud crash ahead of him.  *See* Attachment B, ¶ 8.

46.     In that section of Broadway Street, the roadway widens and there are several medians with concrete curbing along the perimeter and grass within them; those medians are flanked on either side by single travel lanes on which area traffic heads in opposite directions.  *See* Attachment B, ¶ 9.

47.     As Kozlowski approached, he saw a motor vehicle pulled to the right side of the road in front of a Papa John's, a motorcycle on its side in the road, an individual laying on the median grass and two females standing in the vicinity of the individual on the ground.   *See* Attachment B, ¶ 10.

48.     Kozlowski radioed his location to dispatch, asked for emergency medical personnel to respond to the scene, positioned his cruiser in the middle of the road close to the median and activated his cruiser lights to warn travelers in the area of the presence of everyone and everything in or near the roadway.  *See* Attachment B, ¶¶ 12-13.

49.     Kozlowski told the two females to give him space and to leave the roadway so that they would not be struck by another vehicle passing through the area.  *See* Attachment B, ¶ 14.

50.     Kozlowski approached the individual on the ground, later identified as the plaintiff, and saw that he was wearing a helmet and the protective clothing of a motorcyclist.  *See* Attachment B, ¶¶ 11, 15.  The motorcycle was several feet away and it appeared to Kozlowski that this individual had struck the median curb and been ejected off the motorcycle.  *See* Attachment B, ¶ 15.

51.     Kozlowski observed the visor of the plaintiff's helmet was up and his eyes were closed.  *See* Attachment B, ¶ 16.  Kozlowski tapped the plaintiff and asked the plaintiff if he could hear Kozlowski and if he was alright.   *See* Attachment B, ¶ 16.

52.     There was no response for some seconds, until the plaintiff opened his eyes and began to try to get up.  *See* Attachment B, ¶ 17.  Kozlowski told the plaintiff repeatedly to stay still and to await medical evaluation; the plaintiff did not acknowledge Kozlowski and continued to try to get to his feet.  *See* Attachment B, ¶ 17.

53.     Once the plaintiff made it to his feet, the plaintiff appeared to Kozlowski to be unsteady and Kozlowski began to tell him to have a seat until the ambulance arrived.  *See* Attachment B, ¶ 18.

54.     The plaintiff still did not acknowledge Kozlowski and Kozlowski put his hands on one of the plaintiff's shoulder/arm/elbow areas in an escort position to prevent the plaintiff from falling or from wandering into either of the lanes of travel next to the median.  *See* Attachment B, ¶ 18.

55.     Around this point in the sequence of events, defendant Eric Ortiz, another Chicopee police officer working that night, arrived and saw a motorcycle in the roadway and Kozlowski with the plaintiff.  *See* Attachment C, ¶ 6.  The male was wearing a helmet with the visor up, appeared to be unsteady on his feet and seemed to be trying to push away from Kozlowski.  *See* Attachment C, ¶¶ 7-8.  Ortiz heard Kozlowski asking the plaintiff what hurt and stating that an ambulance was on its way.   *See* Attachment C, ¶ 9.

56.     Ortiz approached Kozlowski and the plaintiff and tried to secure one of the plaintiff's arms so that there would be no striking by the plaintiff.  *See* Attachment C, ¶ 10.

57.     It appears to be around this point, with an officer in contact with each of his arms, that the plaintiff generally recalls becoming aware of his surroundings once again.  *See* Attachment A, p. 115.

58.     The plaintiff does not recall feeling pain in his body at that point or having a sense that he was injured, but he does recall the impression that the police officers were trying to "apprehend" him from the first instant that he can recall.  *See* Attachment A, pp. 116-18.

59.     At some point, the plaintiff and the officers then present moved out of the median and into the parking lot of the Papa John's.  *See* Attachment B, ¶ 20.

60.     The plaintiff testified that the officers began to try to "slam" him on the ground, using arm bars, football tackles and strikes.  *See* Attachment A, pp. 121-22.

61.     According to the plaintiff, he was trying to protect himself and to get away from the "beating" and was doing that by trying to get his arms free.  *See* Attachment A, p. 123 ("So I was

really just trying to get my arms free.").  The plaintiff also recalls the officers saying to stop

resisting, to get on the ground and not to move.  *See* Attachment A, pp. 123-24.

62.     The plaintiff described the situation variously as a "fight" and "tussling."  Attachment A,

pp. 121, 123.

63.     For his part, the plaintiff testified that he cannot recall but he possibly pushed a police

officer in this fight.  *See* Attachment A, p. 131.  When asked if he punched or kicked during the

"tussle[,]" the plaintiff responded:  "No, not really.  Maybe trying to kick, but I was strung up

like I was on the cross, so I couldn't really use my arms at all."  Attachment A, p. 131.  The

plaintiff also testified that he was "really just trying to get my arms free[]" and that he probably

also was kicking to get free.  Attachment A, pp. 123, 131-32.  In sum, the plaintiff said that he

"was just trying to break free."  Attachment A, p. 132.

64.     The plaintiff also said that he recalled stomping on his hands and arms by officers during

the encounter.  *See* Attachment A, pp. 132-33.  He also said that he believes that he was struck

by officers over ten times during this tussle.  *See* Attachment A, p. 135.

65.     Kozlowski recalls that, as he repeated instructions to the plaintiff to take a seat and to

remain still, the plaintiff pushed Kozlowski in Kozlowski's chest and moved Kozlowski back to

the point that Kozlowski lost physical contact with the plaintiff.  *See* Attachment B, ¶¶ 20-21.

Ortiz, describing the plaintiff as "fidgety[,]" also indicates that the plaintiff repeatedly attempted

to push away from officers.  *See* Attachment C, ¶ 11.

66.     Kozlowski told the plaintiff to stop or that he would be taken the ground and would be

subject to arrest.  *See* Attachment B, ¶ 21; *see also* Attachment C, ¶ 11.

67.     When the plaintiff continued, Kozlowski and Ortiz attempted to perform a two-man arm

bar takedown technique to bring the plaintiff to the ground, but they were unsuccessful and the plaintiff broke away from them.  *See* Attachment B, ¶ 21; *see also* Attachment C, ¶ 11.

68.    At that point, the plaintiff was facing Broadway Street and took approximately three fast steps directly toward the road.  *See* Attachment B, ¶¶ 22-23.

69.    Including to prevent the plaintiff from running into the road, Kozlowski ran toward the plaintiff and, prior to the plaintiff reaching the road, tackled him from behind and brought him to the ground.  *See* Attachment B, ¶ 23.

70.    The plaintiff was not handcuffed at that point and agreed to take a seat near the Papa John's.  *See* Attachment B, ¶ 25.

71.    The plaintiff told officers that he had to urinate.  *See* Attachment B, ¶ 25; *see also* Attachment C, ¶ 12; Attachment D, ¶ 4.  The plaintiff recalls the first, and really only, thing he can recall being said to officers during this sequence was that he needed to go to the bathroom. *See* Attachment A, pp. 119-20, 124-25.

72.    The plaintiff testified that it did not matter where he went to go to the bathroom, and that he knew that he could not urinate in public, but that he really was asking to go to the bathroom at the side of the nearby building.  *See* Attachment A, pp. 120-21.

73.    Kozlowski recalls that the plaintiff, on his feet again, then began taking several steps to try to break free once more.  *See* Attachment B, ¶¶ 25-26.  Ortiz remembers that the plaintiff asked repeatedly to pee and that he seemed to be trying to make his way toward the Papa John's building.  *See* Attachment C, ¶ 12.  Dumais, describing the plaintiff's behavior as "erratic and uncooperative, said that the plaintiff was trying to pull away from officers and he was telling the plaintiff that public urination was not permissible and that he needed to prioritize getting evaluated medically due to the nature of his accident.  *See* Attachment D, ¶ 4.  For his part, the

plaintiff testified that he does not recall ever receiving a response to his request to go to the bathroom because they were in the "middle" of a "fight" at that point, which was the same period in the sequence that the plaintiff described himself as trying to break free from officers. *See* Attachment A, pp. 121, 123, 131-32.

74.     By around this point, Officer Micky Dumais of the Chicopee Police Department had arrived. *See* Attachment B, ¶ 24.  Dumais states that, upon his arrival, he observed Kozlowski in a physical altercation with the plaintiff and that his initial action was to assist Kozlowski in trying to control the plaintiff. *See* Attachment D, ¶ 3.

75.     Kozlowski and Dumais used an arm bar technique to bring the plaintiff back to the ground. *See* Attachment B, ¶ 26; *see also* Attachment D, ¶ 6.  As Dumais states, his focus was on trying to ensure the safety of the plaintiff and everyone else on scene, with the plaintiff's uncooperative behavior a negative factor in achieving a safe environment for all. *See* Attachment D, ¶¶ 4-6.

76.     According to the plaintiff's version of events, he believes that the unregistered firearm that he did not have a license to carry was on his motorcycle and not on his person that night. *See* Attachment A, pp. 98-99, 126-27.  While the plaintiff does not recall how an officer retrieved the firearm that night, he does recall seeing an officer holding the firearm and being asked questions about the gun. *See* Attachment A, pp. 127, 130-31.[2]

77.     In addition to the firearm, Dumais detected and removed the folding knife from the plaintiff's waistband area. *See* Attachment D, ¶ 6; *see also* Attachment B, ¶ 27.

---

[2] The officers have a recollection as to how the firearm was discovered the is different than the plaintiff's memory; *see* Attachments B, C and D; and the officers' recollection will not be relied upon for purposes of this motion for summary judgment.  Instead, the evidentiary point as agreed to by the plaintiff is that the unregistered firearm that the plaintiff was not licensed to carry was with the plaintiff that night and was recovered by officers.

78.     After the discovery of the firearm and the knife, the plaintiff was handcuffed and frisked for other weapons.  *See* Attachment A, p. 134 (the plaintiff indicating that he was handcuffed at "the end"); *see also* Attachment B, ¶ 27; Attachment C, ¶¶ 14-15 and Attachment D, ¶ 6.

79.     Ortiz obtained the plaintiff's identification card and information from the motorcycle to have a records check performed.  *See* Attachment C, ¶ 16.

80.     That records check revealed that the plaintiff had a suspended driver's license, that he did not have a license to carry a firearm and that there was no firearm registered to him.  *See* Attachment C, ¶ 16; *see also* Attachment B, ¶ 32.

81.     The records check also revealed that the plaintiff had an active warrant for his arrest issued on July 5, 2018; the warrant was a default warrant issued out of the Springfield District Court in a drug possession case.  *See* Attachment B, ¶¶ 32, 34.

**IV.     THE RELEVANT POSTSCRIPT**

82.     The plaintiff was transported to the hospital by ambulance that night.  *See* Attachment A, pp. 128-29; *see also* Attachment B, ¶ 30; Attachment C, ¶ 15.

83.     At the hospital, the plaintiff tested positive for the presence of marijuana in his system and his blood alcohol content at 2:30 a.m. on October 6, 2018 was 170 milligrams per deciliter, which is, for purposes of determining an intoxication level for driving, a .17 blood alcohol content.  Appended hereto and designated as "Attachment J" are the Baystate Medical Center records reflecting that testing.

84.     During his deposition, the plaintiff testified that he has no reason to disagree with the result of the blood alcohol testing and that he had smoked marijuana in the hours prior to his interaction with police.  *See* Attachment A, pp. 179-80.

85.     The plaintiff was cited for, or charged with:  (1) reckless operation of a motor vehicle; (2) speeding; (3) operating after the suspension or revocation of a driver's license; (4) resisting arrest; (5) assault and battery upon a police officer; (6) unlawful carrying of a firearm; and, (7) unlawful possession of ammunition.  *See* Attachment B, ¶ 33.

86.     As of October 6, 2018, the plaintiff also had an active warrant for his arrest.  Appended hereto and designated as "Attachment K" is the warrant information as of 2:06 a.m. on October 6, 2018, with the return on the warrant executed by a member of the Chicopee Police Department.

87.     The 9 mm firearm and the ammunition within the weapon subsequently were tested by the Firearms Identification Section of the Massachusetts State Police and determined to be an operational firearm with live ammunition.  Appended hereto and designated as "Attachment L" is the State Police report documenting that testing.

88.     Through the ensuing criminal prosecution, the charges of:  (1) operating a motor vehicle on a suspended license, with a subsequent offense designation; (2) reckless operation of a motor vehicle and (3) assault and battery on a police officer all were dismissed on January 30, 2020. *See* Docket in *Commonwealth v. Matthew E. Crane*, Chicopee District Court Docket No.: 1820CR001589, pp. 1-2, appended hereto and designated as "Attachment M[.]"  Additionally, the plaintiff was found not responsible for speeding and the charge of resisting arrest was subject to a nolle prosequi.  *See* Attachment M, p. 2.  The remaining charges of carrying a firearm without a license and possession of a firearm without a firearms identification card were tried to a jury, which returned not guilty verdicts.  *See* Attachment M, p. 2.

89.     With regard to injuries, the plaintiff subsequently was diagnosed with a right clavicle fracture.  *See* Attachment A, p. 141.  Although the plaintiff inquired of a doctor shortly after

October 6, 2018, the doctor could not tell him if the fracture occurred as a result of the motorcycle crash or the interaction with police.  *See* Attachment A, pp. 144-45.  No medical provider since has provided the plaintiff with an opinion that discounts the impact of the crash with respect to that injury.  *See* Attachment A, p. 145.

90.     The plaintiff subsequently was diagnosed with a right ankle sprain.  *See* Attachment A, p. 145.  No medical provider has given the plaintiff an opinion as to the cause of that injury.  *See* Attachment A, pp. 145-46.

91.     The plaintiff subsequently was diagnosed with a torn pectoral muscle on his right side.  *See* Attachment A, pp. 146-49.  No medical provider has given an opinion to the plaintiff linking that injury to a particular event.  *See* Attachment A, p. 150.

92.     To the extent that a subsequent diagnosis of a fractured shoulder is distinct from the clavicle injury, no medical provider has given an opinion to the plaintiff as to the cause of that injury.  *See* Attachment A, pp. 149-51.

93.     Although the plaintiff referenced during discovery the existence of post-traumatic stress disorder, during his deposition the plaintiff disavowed that he ever was diagnosed by a medical provider with the disorder and, in fact, the plaintiff never has received any form of treatment for mental or emotional issues either before or after October 6, 2018.  *See* Attachment A, pp. 58-59, 155.  The plaintiff's belief as to his suffering from the disorder comes from speaking with people, none of whom are medical providers, who have been diagnosed with the disorder and believing that he shares at least some symptoms of the disorder with them, including a heightened sense of awareness, agitation and constant worry.  *See* Attachment A, pp. 59-61.

94.     As a capstone for this statement of material facts, and concerning the plaintiff's seizure theory of liability, the plaintiff testified at his deposition that he does not believe any of the charges advanced against him were proper.  *See* Attachment A, p. 157.

95.     At the same time, however, the plaintiff testified that he understood that he was driving a motorcycle without a license, that he possessed a firearm illegally and that those are criminal acts.  *See* Attachment A, pp. 155-57.

96.     The plaintiff also conceded during his deposition that a police officer should investigate a situation in which an individual has been involved in an accident and is laying on the ground unconscious for a time.  *See* Attachment A, pp. 157-58.

DEFENDANTS KOZLOWSKI AND ORTIZ,          DEFENDANT DUMAIS,
By their attorney,                       By his attorney,

/s/ Andrew J. Gambaccini                 /s/ Mark J. Albano
Andrew J. Gambaccini, BBO #: 654690      Mark J. Albano, BBO #:  013860
Reardon, Joyce & Akerson, P.C            ALBANO LAW, LLC
4 Lancaster Terrace                      One Monarch Place, Suite 1330
Worcester, MA 01609                      Springfield, MA 01144
508.754.7285                             413.736.3500
agambaccini@rja-law.com                  mark@albanolawllc.com