UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MATTHEW CRANE,

    Plaintiff,

    v.

CITY OF CHICOPEE, et al.,

    Defendants.

Civil Action No. 20-cv-30159-MGM

MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 63)

September 20, 2024

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

This action arises out of Matthew Crane's ("Plaintiff") October 6, 2018 arrest by officers of the Chicopee Police Department. Plaintiff alleges his arrest was an unconstitutional seizure of his person in violation of the Fourth Amendment to the federal constitution (Count I). He further contends that officers used an unconstitutional degree of force in effectuating his arrest, thereby further violating his Fourth Amendment rights (Count II). Finally, he posits this allegedly unlawful use of force was an assault and battery under Massachusetts state law (Count IV).[1]

In response, the remaining Defendants, individual officers Joseph Kozlowski ("Kozlowski"),

---

[1] Plaintiff's Second Amended Complaint ("SAC") originally contained six counts: Unreasonable Seizure (Count I), Excessive Force (Count II), Failure to Train (Count III), Assault and Battery (Count IV), Intentional Assault and Battery (Count V), and Unconstitutional Policy or Custom/Supervisory Liability (Count VI). In addition to the Defendants discussed in this motion, the SAC brought these claims against the City of Chicopee, the Chicopee Police Department, and Officer Joseph Brunelle. On June 6, 2022, this court dismissed Counts III, V, and VI of the SAC. (Dkt. No. 43.) The court also dismissed all claims as to Officer Brunelle.

Eric Ortiz ("Ortiz"), and Mickey Dumais ("Dumais"), argue that both the seizure of Plaintiff's person and the degree of force used to effectuate the seizure were reasonable under the circumstances. In an alternative argument, they also assert that their actions were protected by qualified immunity. These arguments, they say, entitle them to judgment as a matter of law because no reasonable jury could find a constitutional violation occurred on October 6, 2018.

After considering the undisputed material facts and the parties' legal arguments, the court concludes no reasonable jury could find in Plaintiff's favor. At each stage of the encounter, officers' actions were objectively reasonable. As a result, no unconstitutional seizure occurred, nor did officers use an unconstitutional (or otherwise unlawful) degree of force.[2] Accordingly, the court grants Defendants' motion for summary judgment (Dkt. No. 63) in its entirety.

## II. FACTUAL BACKGROUND

The court construes the facts in the light most favorable to the non-moving party, but ignores conclusory allegations, improbable inferences, and unsupported speculation in doing so. *Prescott v. Higgins*, 538 F.3d 32, 39–40 (1st Cir. 2008).[3]

On the night of October 5, 2018, Plaintiff went to a friend's house in Springfield, Massachusetts to prepare for a night out celebrating an acquaintance's birthday. (Dkt. No. 72, ¶ 20.) There, Plaintiff smoked marijuana, (*Id.*, ¶ 21), while he and his friends devised a plan for the night, (*Id.*, ¶ 22.) After deliberating, the group decided to go to "My Brothers' Place," a bar in Chicopee, Massachusetts. (*Id.*)

As My Brothers' Place was only a ten-to-fifteen-minute drive away, Plaintiff opted to take his

---

[2] "Because [Plaintiff's] excessive force [and unlawful seizure] claims fail as a matter of law, [the court] need not decide whether the Defendants were entitled to qualified immunity." *O'Brien v. Town of Bellingham*, 943 F.3d 514, 532 n. 8 (1st Cir. 2019) (alterations added).

[3] Generally, all record citations will follow the format of ECF No. at ECF Generated Page #, or ECF No., ¶.

motorcycle. (*Id.*, ¶ 23). He made this choice despite knowing his license to operate a motor vehicle was suspended in Massachusetts. (*Id.*, ¶ 8.) Once at the bar, Plaintiff testified he had two beers and several chicken wings. (*Id.*, ¶ 24.) He also testified that he spent approximately $100 on alcohol. (*Id.*, ¶ 25.) Around 1:30 a.m., the lights came on in the bar, signifying it was time to leave. (*Id.*, ¶ 26.) Plaintiff, along with two unidentified women he met at the bar, intended to head to a house party in Springfield. (*Id.*, ¶ 27.) To simplify getting to the party, Plaintiff asked the women to follow him in their car while he drove his motorcycle to a friend's house, where it could be parked for the night. (*Id.*) Everyone would then proceed to the party in the car driven by the women. (*Id.*) While leaving, Plaintiff noticed police cruisers in the area but was not particularly concerned by their presence. (*Id.*, ¶ 33.)

Plaintiff pulled out of the parking lot with the women following behind him. Shortly after, he came upon a stop sign. (*Id.*, ¶ 35.) The stop sign caused him to slow his motorcycle to a speed of approximately seven to eight miles per hour. (*Id.*, ¶ 36) But, before he brought the motorcycle to a complete stop, he was struck from behind by the car being driven by the women from the bar. (*Id.*, ¶ 35.) Based on the force of the collision, Plaintiff estimated the women were traveling at a speed between thirty and thirty-five miles per hour. (*Id.*, ¶ 37.) This collision propelled Plaintiff toward the median of the road, where his motorcycle struck the curb, sending him flying off the bike and tumbling onto the grass of the median strip. (*Id.*, ¶ 38.)

Meanwhile, Officer Kozlowski was patrolling in a marked Chicopee police cruiser on Grove Street in that same city. (*Id.*, ¶ 42.) As Kozlowski traveled in the cruiser, first from Grove Street to Broad Street, and then from Broad Street towards its intersection with Abbey Memorial Drive, he heard sounds he associated with a loud car accident. (*Id.*, ¶¶ 44-45.) Upon reaching the intersection, Kozlowski spotted a motorcycle laying in the road, a man sprawled on the median grass (subsequently identified as Plaintiff), and two women standing beside a car in the parking lot of a Papa John's restaurant across the street from the scene. (*Id.*, ¶ 47.) Kozlowski activated his emergency lights and

called for medical assistance. (*Id.*, ¶ 48.)

Once assured medical help was on the way, Kozlowski left his cruiser to check on Plaintiff. (*Id.*, ¶ 50.) He found Plaintiff laying on the ground with the visor of his helmet up and his eyes closed. (*Id.*, ¶¶ 49-51.) Concerned, Kozlowski tapped Plaintiff and asked if he could hear what the officer was saying. (*Id.*, ¶ 51.) In response, Plaintiff tried to stand up, which alarmed Kozlowski and caused the officer to ask that he remain seated until medical assistance arrived. (*Id.*, ¶¶ 52-53.) Kozlowski's alarm was heightened by Plaintiff's unsteadiness and continued inability to verbally acknowledge the officer. (*Id.*, ¶¶ 53-54.) As Plaintiff was not responding to verbal commands, Kozlowski put his hands on Plaintiff's shoulder, arm, and elbow area—the so-called "escort technique" — with the goal of keeping Plaintiff from falling or stumbling into the road and oncoming traffic. (*Id.*, ¶ 54.)

At this point, Officer Ortiz arrived on scene. (*Id.*, ¶ 55.) Ortiz recalled hearing Kozlowski asking the Plaintiff "what hurt" and telling him an ambulance was on the way. (*Id.*) He also recalled seeing Plaintiff attempting to push Kozlowski away. (*Id.*, ¶ 55.) Ortiz began to assist Kozlowski. Working together in unison, they took positions on either side of Plaintiff and sought to prevent him from striking out at them. (*Id.*, ¶ 56.) Or, as Plaintiff put it, the officers held him "like I was Jesus on the cross." (*Id.*, ¶ 39.) Plaintiff also recalled the officers telling him to get (or stay) on the ground. (*Id.*, ¶¶ 39-41.) Before officers grabbed ahold of Plaintiff's arms and told him to get on the ground, Plaintiff recalled nothing about the period following his accident. (*Id.*, ¶ 57.)

The parties then moved from the median to the parking lot of the Papa John's. (*Id.*, ¶ 59.) There, a physical altercation broke out. Specifically, as described by Plaintiff, the parties were "tussling." (*Id.*, ¶ 62.) During this altercation, Kozlowski and Ortiz continued their efforts to restrain Plaintiff by holding either side of his body. (*Id.*, ¶¶ 61, 63.) In opposition, Plaintiff worked to break his arms free, (*Id.*, ¶ 61); he primarily relied on leg kicks, but also, admittedly, pushed back at officers, (*Id.*, ¶ 63.) At some point, Plaintiff did break free. (*Id.*, ¶ 66.) This prompted Kozlowski to yell for

4

Plaintiff to either stop or be taken to the ground and arrested. (*Id.*, ¶ 66.) Plaintiff did not stop. (*Id.*) Kozlowski then football tackled Plaintiff. (*Id.*, ¶ 69.)

Following the tackle, Plaintiff was placed on the curb. (*Id.*, ¶ 70.) He was not handcuffed. (*Id.*) Once on the curb, Plaintiff informed officers he needed to urinate. (*Id.*, ¶ 71.) He asked to be taken to the side of a building for the purpose. (*Id.*, ¶ 72.) Officers refused, this caused Plaintiff to stand up and attempt to wander off. (*Id.*, ¶ 73.) Concurrent with Plaintiff's attempt to urinate, Officer Dumais arrived on scene. (*Id.*, ¶ 74.) He testified he saw Kozlowski and Plaintiff once again engaging in a physical altercation. (*Id.*) In an effort to end the altercation, Kozlowski and Dumais used an "arm bar takedown" to bring Plaintiff to the ground a second time. (*Id.*, ¶ 75.)

Shortly after Plaintiff was taken down a second time, a firearm was retrieved from the scene of the crash. (*Id.*, ¶ 76.) Plaintiff did not have a license to carry a firearm in Massachusetts, nor was a firearm registered to him. (*Id.*, ¶ 80.) In fact, Plaintiff purchased the gun illegally for $400 behind a local pizzeria. (*Id.*, ¶¶ 11-17.) He testified the gun was necessary for protection, as a motorcycle gang was active in the greater Springfield area at the time. (*Id.*, ¶ 11.) And Plaintiff, while not in a gang, did own a motorcycle. (*Id.*) Because of this threat, Plaintiff kept the gun under the seat of his motorcycle. (*Id.*, ¶ 30.) After the accident, the gun was dislodged from the bike and found in the road; this caused Dumais to pat frisk Plaintiff, whereupon a folding knife was removed from Plaintiff's waistband. (*Id.*, ¶¶ 76-77.) Officers then handcuffed Plaintiff. (*Id.*, ¶ 78.)

Once handcuffed and searched, Ortiz retrieved Plaintiff's identification card. (*Id.*, ¶ 79.) A background check revealed Plaintiff's license to operate a vehicle was suspended and that Plaintiff had an active arrest warrant issued by the Massachusetts state courts. (*Id.*, ¶¶ 80-81.) Instead of transporting Plaintiff to the station, he was brought by ambulance to Baystate Medical Center ("Baystate"). (*Id.*, ¶ 82.) There, a blood test taken at 2:30 a.m., approximately forty-five minutes after the accident and an hour after Plaintiff left the bar, revealed Plaintiff's blood alcohol level to be 0.17, which was over the

5

legal limit of 0.08. (*Id.*, ¶ 83.) Doctors also diagnosed Plaintiff with a broken clavicle, a torn pectoral, and a sprained ankle, but the doctors did not opine whether these injuries were caused by the motorcycle accident or the altercation with police (or some combination of the two). (*Id.*, ¶¶ 89-91.)

As a result of the events of October 6, Plaintiff was charged with (1) reckless operation of a motor vehicle, (2) speeding, (3) operating after suspension or revocation of a driver's license, (4) resisting arrest, (5) assault and battery on a police officer, (6) unlawful possession of a firearm, and (7) unlawful possession of ammunition. (*Id.*, ¶ 85.) The charges of reckless operation, operating without a license, and assault and battery on a police officer were dismissed. After trial, Plaintiff was found not responsible for speeding, and the resisting arrest charge was subject to a *nolle prosequi*. (*Id.*, ¶ 88.)  As to the charges of unlawful possession of a firearm and ammunition, Plaintiff was acquitted by a jury. (*Id.*)

### III. SUMMARY JUDGMENT STANDARD

When ruling on a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). The non-moving party "can forestall summary judgment by presenting definite, competent evidence demonstrating the existence of a genuine dispute about a material fact." *Murray v. Kindred Nursing Centers West LLC*, 789 F.3d 20, 25 (1st Cir. 2015).[4] In contrast, "plaintiffs' own beliefs and impressions [do not] suffice" to create a triable

---

[4] As Defendants note, Plaintiff's decision to append a 241-page transcript of his own criminal trial (Dkt. No. 71) to his opposition in a bid to controvert material facts violates the spirit of Local Rule 56.1. Moreover, Plaintiff's response to Defendants' statement of material facts and Plaintiff's

6

issue of material fact, *Martinez v. Novo Nordisk Inc.,* 992 F.3d 12, 17-18 (1st Cir. 2021), nor may the non-moving party "rely merely upon conclusory allegations, improbable inferences, and unsupported speculation" to forestall summary judgment, *Pina v. Children's Place*, 740 F.3d 785, 796 (1st Cir. 2014).

According to Fed. R. Civ. P. 56(c)(2), a non-moving party may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." In raising Rule 56(c)(2) objections, the "parties are generally subject to the same standards of timeliness and specificity as govern objections at trial," but with the understanding that the "summary judgment setting permits counsel the luxury of time []to carefully frame written objections, in contrast to the pell mell of trial." Wright & Miller, 21 Fed. Prac. & Proc. Evid. § 5036.13 (2d ed.) (alteration added). This means "[t]rial courts, then, may reasonably expect a precision to objections made at summary judgment proceedings that is not possible at trial." *See id.*; *see also Echavarria v. Roach,* 565 F. Supp.3d 51, 64 (D. Mass. 2021) ("Without the benefit of a reasoned explanation beyond assertions that exhibits contain 'inadmissible hearsay,' 'inadmissible opinion,' or 'personal knowledge,' the Court cannot make a well-reasoned decision as to whether the myriad exhibits that Defendants seek to strike should be considered at this stage of the case.").

In his opposition to Defendants' motion for summary judgment, Plaintiff objected to numerous factual statements by citing to Rule 56(c)(2). Plaintiff did not, however, explain why these statements were incapable of presentation in an admissible form. Generally, this type of unfocused

---

memorandum of law do not cite to overlapping portions of the criminal transcript, thereby requiring the court to scour the record to determine which facts (if any) are in genuine dispute and which "facts" were extraneously inserted into the record by way of an opposition brief. *See Corrada Betances v. Sea-Land Serv., Inc.,* 248 F.3d 40, 44 (1st Cir. 2001) ("We have held before, and today reaffirm, that statements contained in a memorandum or lawyer's brief are insufficient, for summary judgment purposes, to establish material facts."). Nevertheless, the court declines to deem the relevant facts admitted based solely on Plaintiff's violation of Local Rule 56.1. *See Butters v. Wells Fargo Advisors, LLC*, No. CIV.A. 10-10072-MLW, 2012 WL 5959986, at *2 (D. Mass. Nov. 27, 2012) (determining the appropriate sanctions for Rule 56.1 violations is a discretionary matter). Although, as will be seen, many of them are deemed admitted for other reasons.

objection is insufficient to raise a Rule 56(c)(2) argument, as the court is unable to analyze the rationale for the objection. But Plaintiff's briefing indicates his objections are based on Fed. R. Evid. 404(b). Specifically, he relies on Rule 404(b)(1), which states: "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Upon review, many of the challenged facts are drawn from Plaintiff's own deposition testimony describing the events of October 5-6. These statements are not being offered as character evidence. Rather, they are Plaintiff's own recollection of events. Moreover, the statements are explicitly admissible as admissions of a party opponent. *See* Fed. R. Evid. 801(d)(2).[5] Consequently, Plaintiff failed to "identif[y] contrary facts supported by references to 'affidavits, depositions and other documentation,'" thereby requiring the court to deem them admitted. *Yourga v. City of Northampton*, 474 F. Supp. 3d 408, 413 (D. Mass. 2020) (quoting D. Mass. L.R. 56.1); *see also* Fed. R. Civ. P. 56(e)(2).

## IV. Discussion

### A. Count I (Unreasonable Seizure)

As to Count I, Plaintiff has not identified a triable issue of fact with respect to his unreasonable seizure claim. Summary judgment is, therefore, appropriate.

"The Fourth Amendment protects against 'unreasonable searches and seizures.'" *United States v. Howard*, 66 F.4th 33, 40 (1st Cir.), *cert. denied*, 144 S. Ct. 226 (2023). But "[t]he Fourth Amendment does not prevent 'all contact between the police and the citizenry.'" *Id.* at 41 (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)). And "no constitutional intrusion arises from police merely 'approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *Id.* at 41-42 (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)). Thus, "[a]

---

[5] The remaining challenged statements are references to Plaintiff's prior convictions, but these are not relevant to the present motion.

Fourth Amendment seizure occurs [only] when a police officer 'has in some way restrained the liberty of a citizen' through 'physical force or show of authority.'" *United States v. Camacho*, 661 F.3d 718, 725 (1st Cir. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968)) (alteration added).

However, as alluded to earlier, a seizure deemed "reasonable" does not violate the Fourth Amendment. *See United States v. Carmona*, 103 F.4th 83, 90 (1st Cir. 2024). For example, a seizure backed by probable cause is reasonable. *See Karamanoglu v. Town of Yarmouth*, 15 F.4th 82, 87 (1st Cir. 2021). "[P]robable cause exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been … committed and that the suspect is implicated in its commission." *Id.* (quoting *United States v. Flores*, 888 F.3d 537, 543 (1st Cir. 2018)). Similarly, under *Terry v. Ohio*, 392 U.S. 1 (1968), officers may briefly detain an individual when they have "reasonable suspicion that the person is or has been engaged in criminal activity." *United States v. Mouscardy*, 722 F.3d 68, 72 (1st Cir. 2013). Reasonable suspicion means "a particularized and objective basis for suspecting the person stopped of criminal activity." *Klaucke v. Daly*, 595 F.3d 20, 24 (1st Cir. 2010) (internal quotation marks omitted). A valid *Terry* stop is also reasonable. Therefore, seizures backed by probable cause or reasonable suspicion do not violate the Fourth Amendment.

As uniquely relevant here, in *United States v. Howard*, 66 F.4th 33, the First Circuit considered whether an officer's arrival at the scene of single car accident constituted a seizure for Fourth Amendment purposes. *Id.* at 41. The *Howard* court concluded it did not, as the vehicle was not brought to a halt by a show of authority, but rather stopped by an independent force—the car accident. *Id.* After reaching this first conclusion, the *Howard* court went on to hold that no seizure occurred when officers took reasonable measures to ensure the safety of the vehicle's occupants at the scene of the crash. *Id.* at 42-43. Nor did responding officers violate the Fourth Amendment by asking the people present for identification, as this was "the type of *de minimis* intrusion that we have long agreed to tolerate as a necessary part of policing." *Id.* at 43 (quoting *United States v. Tanguay*, 918 F.3d 1, 7 (1st

9

Cir. 2019)). Accordingly, the Fourth Amendment is not implicated every time the police respond to an accident. *Id.* at 43.

In this case, *Howard* forecloses most of Plaintiff's unlawful seizure claim as a matter of law. Kozlowski's "arrival on scene and initial accident response, which included speaking with the occupants about the crash and running identification checks," was not a seizure for purposes of the Fourth Amendment. *Id.* at 42. Here, as in *Howard*, Plaintiff was not restrained by either a use of force or an assertion of authority by Kozlowski. *Id.* Rather, it is undisputed Plaintiff was brought to a halt by a car accident.[6] Facing these circumstances, Kozlowski's decision to stop and investigate was reasonable. *See, e.g., United States v. Rodriguez-Morales,* 929 F.2d 780, 784-85 (1st Cir. 1991) ("The policeman plays a rather special role in our society; in addition to being an enforcer of the criminal law, he is a 'jack-of-all-emergencies' … [d]ealing with vehicle-related problems ranks among such responsibilities." (alteration added)). Consequently, Plaintiff has no supportable claim that Kozlowski's decision to stop and check on his wellbeing violated the federal constitution.

---

[6] In addition, under the so-called "community caretaker" exception, Kozlowski's actions were of the sort reasonably "expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing and provide an infinite variety of services to preserve and protect public safety." *United States v. Gemma*, 818 F.3d 23, 32 (1st Cir. 2016) (quoting *United States v. Rodriguez-Morales*, 929 F.2d 780, 784-85 (1st Cir. 1991)). This exception "can apply in situations when … a person outside of a home has been seized for a non-investigatory purpose and to protect that individual or the community at large." *Vargas v. City of Philadelphia*, 783 F.3d 962, 972 (3d Cir. 2015) (applying community caretaker exception to officers' decision to block mother from driving daughter to hospital during an asthma attack because an ambulance was on the way); *Lockhart-Bembery v. Sauro*, 498 F.3d 69, 75-76 (1st Cir. 2007)(applying community caretaker exception to officer's decision to order motorist to push car off road as it was obstructing traffic); *United States v. Touzel*, 409 F. Supp. 2d 511, 519 (D. Vt. 2006), *aff'd*, 281 F. App'x 37 (2d Cir. 2008) (finding the community caretaker exception justified officers stopping vehicles at scene of a motor vehicle accident and inquiring where they were heading). In *Howard*, the First Circuit found it unnecessary to address whether officers' actions were justified under the community caretaker exception because it concluded officers were (i) not initially orchestrating a *Terry* stop and (ii) reasonable suspicion supported officers' subsequent actions. *See Howard*, 66 F.4th at 43 n. 3. As this case closely mirrors *Howard*, this court does the same. But, however framed, it is not a violation of the Fourth Amendment for a police officer to take steps aimed at rendering aid to a man lying injured because of an obvious motorcycle accident.

However, the court's conclusion that Kozlowski's initial accident response did not infringe Plaintiff's constitutional rights is not the end of the analysis. Rather, the "next task…[is] to determine whether a seizure occurred at any point thereafter." *Howard*, 66 F.3d at 44 (alteration added). Turning to the remainder of the interaction, the court finds no unlawful seizure.

Here, even if the initial encounter morphed into an investigative detention, Plaintiff's detention was justified pursuant to *Terry*. Once Kozlowski encountered the accident scene, he was statutorily empowered to demand Plaintiff produce his license. *See* Mass. Gen. Law ch. 90, § 25. As Massachusetts law also requires that traffic citations be issued "at the time and place of the violation," officers had further legal grounds to detain Plaintiff while they investigated the circumstances of the accident to determine whether a citation was appropriate. *Commonwealth v. O'Leary*, 101 N.E.3d 271, 272 (Mass. 2018).[7] Moreover, upon reaching Plaintiff, officers discovered him unconscious. When he regained consciousness, he was unsteady and demanding to urinate on the side of a building. These observations, together with the car accident and the hour of the night, justified a reasonable suspicion that Plaintiff had been in intoxicated at the time of his accident. Finally, it is undisputed that Plaintiff engaged in a struggle with the officers. This struggle, rather than any tactic employed by the police, prolonged the *Terry* stop leading to Plaintiff's formal arrest. Based on the totality of the circumstances, Plaintiff's detention before his formal arrest was a justified investigatory detention.

Next, Plaintiff contends officers lacked probable cause for his formal arrest. But officers had probable cause to arrest Plaintiff for several crimes. Specifically, each of the following undisputed facts supported probable cause: (1) Plaintiff was not licensed to operate a motor vehicle; (2) he had an illegal

---

[7] As a matter of state law, the Massachusetts Appeals Court has noted, "it is well-established that the questioning of persons at the scene of an accident to determine what happened is appropriate 'to verify or dispel a reasonable suspicion of criminal activity.'" *Commonwealth v. Ward*, 12 N.E.3d 1052, 2014 WL 3746447 (Mass. App. Ct. 2014) (table) (quoting *Commonwealth v. Kirwan*, 860 N.E.2d 931, 938 (Mass. 2007)).

firearm found in the road; (3) he was unsteady on his feet at approximately 1:45 a.m. while asking to urinate on a building after getting in a traffic accident; (4) he engaged in a fight with officers; (5) he was carrying a folding knife in his waistband; and (6) he had an active arrest warrant from a Massachusetts state court. These facts, even if viewed in isolation, would constitute probable cause for Fourth Amendment purposes. When viewed together, they clearly justified Plaintiff's arrest.

In response, Plaintiff appears to assert the police did not have probable cause because a jury subsequently acquitted him at his criminal trial on the firearms charge. But as the probable cause analysis turns on "whether the facts known at the time of the arrest objectively provided probable cause to arrest," *Goddard v. Kelley*, 629 F. Supp. 2d 115, 124-25 (D. Mass. 2009) (internal quotation marks omitted), lack of probable cause "cannot be inferred merely from the fact of acquittal," *Bird v. City of New Bedford*, No. CV 17-12159-FDS, 2019 WL 4394914, at *6 (D. Mass. Sept. 13, 2019); *see also Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979) ("[T]he mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest."). Accordingly, summary judgment is granted as to Count I.

### B.  Count II (Excessive Force)

As to Count II, Plaintiff has not demonstrated the existence of a triable issue of fact with respect to his excessive force claim. Summary judgment is, therefore, appropriate.

"One point of the Fourth Amendment is to protect an individual from a police officer's use of excessive force in effectuating a seizure." *Stamps v. Town of Framingham*, 813 F.3d 27, 35 (1st Cir. 2016). But, as discussed earlier, the Fourth Amendment does not prevent all seizures (or uses of force) by government agents; rather, it guards against those deemed unreasonable. *See Plumhoff v. Rickard,* 572 U.S. 765, 774 (2014). Put differently, "[t]he Fourth Amendment is implicated where an officer exceeds the bounds of reasonable force in effecting an arrest or investigatory stop." *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010).

In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court set forth the standard for determining reasonableness in the context of an excessive force claim. As the *Graham* court explained, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The Supreme Court then articulated three factors— "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight"—for lower courts to consider in conducting a reasonableness analysis. *Gray v. Cummings*, 917 F.3d 1, 8 (1st Cir. 2019) (quoting *Graham*, 490 U.S. at 396) (alterations in original)); *see also Lachance v. Town of Charlton*, 990 F.3d 14, 21 (1st Cir. 2021). Ultimately, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers … violates the Fourth Amendment." *Graham*, 490 U.S. at 396.

Before applying *Graham*, the court observes the framework articulated in the case applies most naturally to uses of force attendant to formal arrest. *See Lachance*, 990 F.3d at 26 (citing *Estate of Hill by Hill v. Miracle*, 853 F.3d 306, 313 (6th Cir. 2017)). Its application to the use of force attendant to a medical emergency is more awkward. The degree of force that is reasonable in responding to a medical emergency requires careful consideration of the totality of the circumstances confronting officers. And this court finds persuasive the following statements of the Fourth and the Ninth Circuits: "[t]he use of force that may be justified by' the government's interest in seizing a mentally ill person [or person who may pose a risk to themselves or others because of a medical incident], therefore, 'differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community.'" *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010)) (alteration added).

Recognizing the difficulties inherent in applying *Graham* to uses of force arising from interactions between citizens and police that are non-criminal in origin, the Sixth and the Eleventh Circuits have modified the test. In *Estate of Hill*, the Sixth Circuit framed it this way:

> Where a situation does not fit within the *Graham* test because the person in question has not committed a crime, is not resisting arrest, and is not directly threatening the officer, the court should ask:
>
> (1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?
>
> (2) Was some degree of force reasonably necessary to ameliorate the immediate threat?
>
> (3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

853 F.3d at 314.

The Eleventh Circuit, when presented with similar issues in *Teel v. Lozada*, 99 F.4th 1273 (11th Cir. 2024), declined to adopt the Sixth Circuit's test word-for-word but went on to explain, "the *Graham* test is flexible depending on the nature of the scenario that the officer encounters." *Id.* at 1284. It was, therefore, not erroneous for a district court to substitute the first and second *Graham* factors—seriousness of the offense and resistance—for language that more accurately reflected the nature of the scenario officers faced. *Id.* at 1283. These two decisions relied on *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), where the Supreme Court substituted consideration of seriousness of the offense for consideration of the "severity of the security problem at issue," while reiterating the *Graham* factors are not exhaustive, they merely "illustrate the types of objective circumstances potentially relevant to a determination of excessive force." *Id.* at 397 (alteration added). Because of *Kingsley*'s emphasis on the flexibility of the *Graham* inquiry, the court finds the reasoning of the Eleventh Circuit particularly persuasive. Thus, the court will retain the *Graham* framework, but account for the test's flexibility when appropriate.

14

Beginning with the third *Graham* factor (active resistance or evasion), it is undisputed Plaintiff engaged in a physical altercation with officers. It is also undisputed that Plaintiff attempted to run away from officers. These actions constitute both resisting and evasion. Moreover, even though the interaction did not begin as an arrest, Plaintiff's incoherence, coupled with his attempts to flee toward a public road, justified officers using a degree of force. This force was necessary to protect Plaintiff from oncoming traffic and oncoming traffic from Plaintiff. Stated differently, Plaintiff's behavior, even if attributed to an individual undergoing a medical emergency, was sufficiently akin to resisting and evading to point the third *Graham* factor in Defendants' favor.

Next, as to the second *Graham* factor (danger to officers), when officers first arrived on scene Plaintiff posed no danger. But Kozlowski's first physical touch of Plaintiff—a tap—was not a use of force. Rather, it was a reasonable attempt to determine if Plaintiff was in medical distress. As the interaction continued, a struggle developed between officers and an outwardly incoherent Plaintiff. Once this altercation was underway, Plaintiff was a danger to officers because "[a]n arrest of a struggling defendant … is a serious business … [with the] potential for serious violence and of injury." *Abraham v. Nagle*, 116 F.3d 11, 14 (1st Cir. 1997). This inherent degree of risk was heightened by the timing and location of the struggle. It was further exacerbated by Plaintiff's inability to understand officers or respond to them verbally. In response, officers relied on verbal commands, the grabbing of arms, attempts at redirection, and ultimately grappling techniques to bring Plaintiff to the ground. As a matter of law, these techniques were a reasonable and proportional reaction to the danger posed by Plaintiff.

Finally, as to the first *Graham* factor (seriousness of the offense), the court finds this factor initially weighs in favor of Plaintiff because it is undisputed that he was not initially suspected of a crime. Nevertheless, officers were concerned for Plaintiff's medical state; this concern justified some degree of physical force to prevent him from wandering into a public street. The limited degree of

force used during the first moments of the encounter (*i.e.*, before reasonable suspicion and probable cause arose) was commensurate with protecting Plaintiff from the consequences of his own refusal (or inability) to listen. *Compare O'Brien*, 943 F.3d at 530-32 *with Lachance,* 990 F.3d at 22 n. 7.

Moreover, even assuming the degree of force used by officers became disproportionate to that which is reasonable in responding to a noncompliant individual in medical distress, Plaintiff was not free to leave the scene of his motor vehicle accident for other reasons. Specifically, he was subject to a valid *Terry* stop. And officers may use reasonable force to effectuate a *Terry* stop. *See Graham*, 409 U.S. at 396; *see also United States v. Pontoo*, 666 F.3d 20, 30-31 (1st Cir. 2011) (collecting cases). Once Plaintiff continued struggling with officers, concern for his medical situation, intoxication, and the need to investigate his accident gave way to probable cause to arrest him for resisting arrest, assault and battery on a police officer, and disorderly conduct. After this escalation, the third *Graham* factor turned decisively in favor of Defendants, as "several of the crimes at issue here—resisting arrest [assault and battery on a police officer] and disorderly conduct—were 'sufficiently serious to warrant the exercise of force.'" *Morrissey v. Town of Agawam*, 883 F. Supp. 2d 300, 310 (D. Mass. 2012) (quoting *LaFrenier v. Kinirey*, 478 F.Supp.2d 126, 138 (D. Mass. 2007) (alteration added), *aff'd* 550 F.3d 166 (1st Cir. 2008)).[8] As a result, the court concludes the undisputed material facts demonstrate no reasonable jury could find officers used an objectively unreasonable degree of force at any stage of their encounter with Plaintiff.

---

[8] In addition, officers' actions remained at the lowest levels on the continuum of available force even after probable cause to arrest Plaintiff arose. While "[t]here is no Constitutional requirement that the police use the least intrusive means available to respond to a situation … availability and feasibility of non-lethal force options is a factor that courts consider in assessing the reasonableness" of officers' actions. *McKenney v. Mangino*, No. 2:15-CV-00073-JDL, 2017 WL 1365959, at *13 (D. Me. Apr. 12, 2017), *aff'd in part, appeal dismissed in part*, 873 F.3d 75 (1st Cir. 2017); *see also Montel v. City of Springfield*, 386 F. Supp. 3d 67, 77 (D. Mass. 2019) (explaining failure to use alternative methods of force is not dispositive but may be worthy of consideration). The officers' decision not to use batons, not to taser Plaintiff, and not to brandish firearms, reflects a degree of restraint that favors a finding of reasonableness during an arrest backed by probable cause.

Accordingly, summary judgment is granted as to Count II.

### C. Count IV (Assault and Battery)

As to Count IV, alleging assault and battery under Massachusetts law, summary judgment is also appropriate. Massachusetts has long recognized police officers may be held liable in tort for assault and battery. *See Powers v. Sturtevant,* 85 N.E. 84, 84 (Mass. 1908). "However, Massachusetts law also allows an officer to use reasonable force in conducting a lawful arrest: reasonable force is a valid defense to assault and battery." *Raiche*, 623 F.3d at 40 (internal citation omitted). And "[w]here [as here] a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, [the court's] determination of the reasonableness of the force used under § 1983 controls [the court's] determination of the reasonableness of the force used under the common law assault and battery claims." *Id.* (alterations added). Because the court finds the force used was reasonable as a constitutional matter, Plaintiff has no viable state law claim for assault and battery. Accordingly, summary judgment is granted as to Count IV.

### V. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. (Dkt. No. 63.) The case may now be closed.

It is So Ordered.

    /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge